DURYEA et al. v. ZIMMERMAN et al.

(Supreme Court, Appellate Division, Second Department. February 17, 1911.)

FRAUD (§ 58*)—DECEIT—EFFECT—EVIDENCE.

    In an action for deceit caused by misrepresentation of facts in a prospectus whereby plaintiff alleged he was induced to buy stock in a foreign corporation, evidence *held* insufficient to sustain a finding that plaintiff saw the prospectus, and was influenced by it prior to purchasing the stock.

    [Ed. Note.—For other cases, see Fraud, Cent. Dig. §§ 55–59; Dec. Dig. § 58.*]

Appeal from Trial Term, Westchester County.

Action by Frances C. Duryea and others, executors of the last will and testament of William Duryea, deceased, against Eugene Zimmerman and another, impleaded with others. From a judgment for plaintiffs and from an order denying a motion for a new trial, defendants Eugene Zimmerman and William C. Rogers appeal. Reversed, and new trial granted.

See, also, 121 App. Div. 560, 106 N. Y. Supp. 237, and 123 App. Div. 805, 108 N. Y. Supp. 548.

Argued before JENKS, P. J., and BURR, THOMAS, CARR, and RICH, JJ.

Rush Taggart, for appellant Zimmerman.

Edward M. Shepard (Franklin Pierce, on the brief), for appellant Rogers.

Robert B. Honeyman, for respondents.

JENKS, P. J. This action is for deceit in a prospectus, whereby the plaintiff was induced to buy stock of the Alabama & Georgia Iron Company. The transaction was exclusively between Van Sickle, an employé of Grant Bros., a firm of stockbrokers, and Gilchrist, an employé of the defendants Rogers, Brown & Company, who had been authorized by them to take subscriptions for the stock. Gilchrist interested Van Sickle to secure the subscription in question, which was to their mutual advantage perforce of certain commissions. Inasmuch as the deceit was in a prospectus, proof of the exact time when the fraudulent representations were made was not naturally or apparently as essential as if the representations had been direct or oral; for generally it would have sufficed for this feature of the case to show the existence of the prospectus at the time of the subscription. The plaintiff complained that "on or about October 19,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

1899," the defendants organized the corporation, and "on or about that date" they prepared the prospectus, circulated it; that it was delivered to him to induce him to purchase stock therein; and that in reliance thereon he purchased the stock, but the date of the purchase was not stated. The case has been tried twice. During the period that intervened the two trials the plaintiff died. His testimony at the first trial was read at this trial. The plaintiff testified that he first conversed with any one at Grant Bros. with respect to this property in the latter part of 1899, he would say it was the latter part of October, and that the conversations continued until November or December. He could not state definitely when he spoke about taking the stock, but it was subsequent to November 1st. He could not give the exact date when he first saw the prospectus, but it was handed to him by Grant Bros. in the latter part of that year. Upon cross-examination he testified that the first conversation with Van Sickle might have been as early as the latter part of October, but, as definitely as he could say, in the latter part of that year. It appeared that he had bought a large quantity of stocks in 1899. The testimony of Van Sickle taken at the first trial, and read upon the second trial, is that he had a conversation with Gilchrist in 1899, and thereafter offered some of this stock to the plaintiff, who subscribed for it, and that Van Sickle then had a prospectus in his hand. He had talked with the plaintiff about a month. The plaintiff agreed to subscribe, as near as he could recollect, in the fall of 1899. It was late in that fall. He presumed it was after he had given the prospectus to the plaintiff. He would say it was afterwards. His best recollection was that plaintiff had the prospectus first. As near as he could determine it, he had the conversation with Gilchrist some time in the fall of 1899. He thought he must have had the prospectus before he talked with the plaintiff. He had a number of them. His recollection was that he had the circular first. He had no books or memoranda of the transaction. It was only his indefinite recollection that it was some time in the fall of 1899. When pressed whether he could testify that the transaction did not occur in August, he answered that he could not fix any date except that it was in the fall of 1899. He did not think it occurred in the month of August. He thought it was later, but he was not positive. He knew that it was in the latter part of a year "six or seven years ago."

It is hard to suggest any reason why the plaintiff, an investor in many stocks in that year, who was accustomed to invest upon the recommendations of his brokers, would have had impressed upon his memory the exact date of this particular subscription, made through them or their employé, or why the employé would have been impressed in like fashion at the time. And so their testimony after the lapse of six or seven years was naturally indefinite so far as the month is concerned. But when the undisputed testimony of the defendant established beyond question that the prospectus was not printed until November 11, 1899, then, presumably for the first time, it appeared essential to the plaintiff's case to establish that his subscription to the stock was made prior to that day.

The proof to establish this fact rests upon the testimony of the plaintiff, Van Sickle, and Grant, the senior member of Grant Bros., at the first trial, which was read at this trial, and the testimony of Van Sickle at this trial. I fail to find any testimony from the plaintiff as to the time of the subscription other than that which I have quoted. Van Sickle when called upon this trial was, of course, awake to the importance of the time of the subscription relative to November 11, 1899. I am not prepared to say that his recollection upon this trial may not have been more clear than upon the former trial, in that he directed his memory to recall a time now important. But nevertheless he is not a witness who now testifies on a subject to which his attention was not then particularly directed, but a witness who, when that subject is now essential, is positive when he had been uncertain, and is clear when he had been indefinite. Van Sickle upon this trial testifies that there was no doubt that the plaintiff had the prospectus before he subscribed for the stock. He testified upon his direct examination:

"Q. Did you give Mr. Duryea the prospectus before he subscribed for the stock? A. I don't think there is a question of doubt about it.

"Q. Did you? A. This is 10 years ago or more. I gave him the prospectus.

"Q. Before he subscribed? A. I am positive of that."

On cross-examination the witness said:

"He [the plaintiff] did not take his subscription until he got his prospectus. * * * I am now unable to fix the date when Mr. Duryea gave his subscription."

Referring to his testimony on the first trial, he was asked:

"Q. Is it not the fact that you were unable to fix it? A. In the fall of 1899 I said.

"Q. You were absolutely unable to fix the time until you learned the date of the printing of that prospectus, is not that the fact? A. No, sir; I said late in the fall of 1899. You will find it in my former testimony. No; I could not fix the month, eight years had elapsed."

In the giving of this testimony there is one fact which is significant. The witness unconsciously indicated that he labored under the natural difficulty of determining a point of time after the lapse of so many years. Thus in his testimony on the first trial he said as to his conversation with Gilchrist:

"I do not know when it was brought out. It was in the latter part of the year. Six or seven years ago."

In his testimony upon this trial which I have just quoted, when asked whether he gave the prospectus to Duryea before subscription, he first answers, "I don't think there is a question of doubt about it," and when pressed, "Q. Did you?" he answers first as it were in unconscious protest, "This is ten years ago or more," and then "Yes," and then, which is not categorical, "I gave him the prospectus." And later on, when asked whether Mason's (another subscriber) stock was paid for on date of November 6th, he replies: "I cannot give you any date of things happening 12 years ago." Grant testified that he thought that the first of his conversations with Duryea was

late in October, when, reading the prospectus, he told Duryea "it was an excellent thing." But immediately he continues:

"Mr. Duryea said he wanted the prospectus. I said 'Mr. Duryea, it is not ready yet; but I will tell you the subscription will be all absorbed.'"

He then testifies that, when he received the prospectus, they went over it carefully, "as Mr. Duryea said, 'I will take $20,000 of that subscription.' That must have been in November." And then he testifies that the order was given almost immediately after they received the prospectus. He also testifies that he knew positively that Duryea did not subscribe until after he received the prospectus. I defer further comment upon this testimony until after discussion of the defendants' evidence upon this feature of the case.

Gilchrist was called by the plaintiff upon the first trial, and his testimony thereat was read upon this trial. He testified that he placed the stock in the hands of Van Sickle in the latter part of August or the first of September, not later than the middle, and this he knew to a certainty. "Some of the reasons" for that certainty were found in a letter written to the witness by his principals, and received on September 20, 1899. Gilchrist says that he had sold the stock before that time, had talked with Van Sickle before that time. Grant Bros. had then taken the stock, and Van Sickle had told him that Duryea had bought it. And he is certain he had not given the prospectus to Van Sickle at that time. The letter is as follows:

"Rogers, Brown & Co.

"New York, Sept. 20th, 1899.

"Robert Gilchrist, Esq., Amagansett, L. I.

"Dear Sir: We have called on all subscribers to the Alabama & Georgia Iron Co. for 25% of their subscription, cash payment. Will you please advise the name of your subscriber for $25,000 in order that we may send him his notice?

"We understand that of the $50,000 put in your hands to be placed, you have only obtained subscription to date for $25,000. From another source we are offered $14,500 subscription, which we wish to apply against this $25,000 undisposed of on your part, provided it does not conflict with definite arrangements made by you. Please advise at once and oblige,

"Yours Truly,                    Rogers, Brown & Co.

"Dict. P. I.

"If second 25 M is disposed of on whom shall we call for payment."

Gilchrist testifies also that he had reported this transaction at the time to Isham, who had charge of the subscription book. Gilchrist says that Van Sickle told him that he was trying to sell the stock to Duryea in August, September, or possibly the latter part of July. Upon this trial Gilchrist testifies that the letter I have quoted referred to the stock in question, and that before its date Van Sickle told him, before he went on a vacation, that Grant Bros. had sold the stock to Duryea, and that he had received this letter addressed to him when on a vacation at his mother's home in Amagansett. I may interject that there is no doubt that such communication was made by Van Sickle at some time, for Van Sickle testifies after Duryea told him he would take the stock, "I notified Mr. Gilchrist to that effect, after that we secured the stock." Isham identifies the letter as written by him to Gilchrist to obtain the name of the cus-

tomer and the stock and so forth that he sold. He testifies that Gilchrist responded, and that or about that time he made a record entry in his book in regular order, and that it was reported to him on September 25, 1911. The record was then read in evidence and its correctness was testified to. It is as follows:

| Subscriber. | Amount Sub. | Ratio. | | Reported by. | Amount Called. |
|---|---|---|---|---|---|
| Wm. Duryea, c/o Grant Bros., 45 Broadway, N. Y. | 25,000 | Pref. 1.85 F. Der. 1.20 R. G. 65 | Com. 2 1.20 80 | 9/25 R. G. | 9/25   6250 10/11  18750 |

| Amount Paid. | Rect. given. | Re't Returned. | Pref. Stock or'd. | Common stock or'd. |
|---|---|---|---|---|
| 2/11/00 25000 | | From P. I. | To order Grant Bros. 47875 25 ——— 47900 Don't issue | 30000 |

The witness then explains:

"The first column, William Duryea, care of Grant Bros., 45 Broadway, New York, that means that a subscription was reported to me to William Duryea and is addressed Care of Grant Bros., 45 Broadway, New York, $25,-000. That means the subscription to the amount of $25,000. 1.85  2, that means 1. of 85 preferred and 2 shares common, for which $100 was paid in and below that is a memorandum about the division of it. 9/25 R. G. September 25th, reported by Robert Gilchrist. Yes, it was reported by Robert Gilchrist. Yes; I made an entry at that time. It is on the books, and I made the entry. I have no doubt about it. Q. And it was made at that time? A. Yes. 9/25  6250, meaning a call was made, the firm call on the 25th of September for payment of one-quarter, that is 6250 and 18750. Yes, we made a call on both of these occasions. I had a regular form of notice; it was mailed to Mr. William Duryea, care of Grant Brothers. The next column 'Paid February 1st, 1900, $25,000.' There is nothing here to show whose check paid it. The stock was issued to the order of Grant Brothers 47,875 and 30,000. There is an entry in red ink, 'P. I. 47,900 of the preferred.' That quarter of a share was a quarter of a share that I sold to them to make it come even. I do not know when the prospectus was issued."

Gilchrist's testimony is not subject to the criticism applicable to that of Van Sickle, in that it is an unsupported effort of memory, because it is supported by extrinsic evidence that makes for its correctness. And, moreover, a cash book of Grant Bros. was produced with the following entry:

1899.                                                                          Folio.
Oct. 23.   By William Duryea.
                    Box 240 Ala. Sub. Com.  .................. 140
                          240  "    ."  Pr.    .................        20,000.

This entry is not made by the sellers of the stock, but by the purchaser. It will be remembered that Gilchrist testified that he reported

the sale, so that it was entered on September 25th by Isham in the subscription book. The variance in the figures is explained by testimony of Gilchrist that Duryea finally decided to take but $20,000, and that Grant Bros. were to assume the balance of $5,000. It appears from the testimony of Van Sickle that the stock was not issued, and Grant Bros. did not pay for it for some time after Duryea had subscribed. Van Sickle thinks it was in the following February. And he says that he does not remember whether he received the money, or whether it was charged to Duryea's account. When Grant was confronted with the entry of October 23d, in view of his testimony that Duryea did not subscribe until he received the prospectus, he said: "I suppose they found a check drawn in the check book, and put it down carelessly." He then continued that he had done a good deal of business for Duryea, and it was a sine qua non with him that he must have the prospectus. When asked if that was the whole explanation as to fixing the date in November, he said that he had gone into the matter since, that, when he heard that Duryea had brought the suit, he had refreshed his memory, and it (the question of the prospectus) had come back to him. "Q. You heard the date when that was printed? A. I heard them say something about November, but I really did not follow the date. This testimony is not the only thing that refreshed my recollection. I find it was November. Last January, when we took the matter up, what I found were the checks, the payments." But his further testimony is of little value, for the checks indicate nothing definite as to the date of the subscription. His theory seems to be that a check of Grant Bros. was given in November, 1899, for the subscription to Rogers, Brown & Co., but in this he is contradicted virtually by all of the other witnesses, who testify that the payment by Grant Bros. was not made until February. And the final refuge of the witness is that the books were wrong and false and behindhand anyway.

I am led to the conclusion that the plaintiff did not sustain the burden of proof that the subscription of Duryea was subsequent to the issue of the prospectus. As I have said, the only actors in the transaction were Van Sickle and Gilchrist. There is no substantial dispute between them as to the details save the question whether the subscription was made before or after November 11th. As I have pointed out, the exact time was not of moment when the transaction was had, and its importance was only apparent after the lapse of these years. Gilchrist is supported by documentary evidence which is not assailed or weakened, and which has no earmarks of manufacture; for it is evidence such as would be natural to the transaction itself—the record of the subscription in the subscription book of the seller, the letter of inquiry from the seller as to the details, and the entry in the book of the buyer, or at least of his brokers. Van Sickle is finally positive from his memory alone, and only positive after the issue is presented as vital to the case. Moore on Facts quotes the utterance of Lumpkin, J., in Miller v. Cotten, 5 Ga. 341, 349:

"I would sooner trust the smallest slip of paper for truth than the strongest and most retentive memory ever bestowed on mortal man."

In Guy v. Mead, 22 N. Y. 462, 466, also cited by Moore, Denio, J., says:

"I have not intended to be influenced in my conclusion as to the true rule of evidence by the peculiar aspect of this case; but I cannot avoid remarking that if this computation of interest was actually made, as stated, in April, 1848, for the purpose of ascertaining the amount due on the note, the memorandum of it then made is one of the most satisfactory pieces of evidence which could be adduced as to the existence of the indorsement. The parties to the alleged transaction had sworn differently upon the point, and several alleged declarations on one side or the other had been given in evidence. If this paper was made at the time and for the purpose claimed, it furnishes written evidence of the most authentic character, made when the party who now seeks to produce it to the jury had no interest in fabricating it. To my mind it would be more persuasive evidence than any amount of oral statement verified by the oaths of the parties interested, or of verbal declarations proved to have been made by those parties."

In Jackson v. Loomis, 12 Wend. 27–29, Savage, Ch. J., says:

"The character of the testimony produced for the defendant being documentary, existing at the time the event is supposed to have happened, or shortly thereafter, entitles it to more credit than evidence resting in the memory of men during so great a length of time. * * * 'The best recollections and the greatest degree of self-reliance in the statement of past facts may derive force and reliability from truthful memoranda made at the time of the transaction,' said Chief Justice Alvey of Maryland. * * * A contemporaneous written memorandum of a transaction is more likely to be correct than unaided recollection several years afterward, on the general presumption that written evidence is far more trustworthy than oral." Moore on Facts, p. 960.

It is true that the plaintiff at the first trial testified that he did not purchase the stock until after he had read the prospectus, but (I say it kindly enough) it was essential to his case that he should so testify. Doubtless he saw the prospectus and read it some time, but it may well have been after the subscription but before the stock was actually received by him. There was no probability that he read the prospectus because it was natural that he should wait for it and rely upon it before his subscription; for he was, as we have seen, an investor in many stocks in that year through Grant Bros., and was accustomed to rely upon their recommendation. And he testifies that this was one of the class of stocks which they were specially recommending. He testifies:

"He testifies they made a special drive at me as to my taking it. * * * There was no difference in the manner in which I acquired this stock from that of any other stock."

It appears that after the stock was subscribed for it was charged to his account, as Grant Bros. had a balance of Duryea's there in their hands, and he testifies that he paid for it "a number of months thereafter." Van Sickle says that the stock was not delivered until some time after he returned Duryea's subscription. Under such circumstances, it was entirely natural that Duryea should have discussed with Grant the prospects of the investment, and have received and read the prospectus after his subscription had been made. It was

quite a different situation from that of an investor who purchases stock, receives it forthwith, and then ends the transaction.

I advise that the judgment be reversed and a new trial be granted, costs to abide the event. All concur.