THEODORE F. VON DORN and FRANK WEEKS, Respondents, *v.* ROSCOE CRARY, Individually, Appellant, Impleaded with Others, Defendants.

*Principal and agent — commissions — liability of president of corporation personally for commissions on sale of real estate — verdict in favor of plaintiffs not against weight of evidence.*

Appeal by defendant, Roscoe Crary, from a judgment of the Supreme Court, as amended, in favor of the plaintiffs and against him individually, entered in the New York county clerk's office July 2, 1919, upon the verdict of a jury and upon a verdict directed for the defendant Dare Lumber Company, and upon a verdict rendered for the defendant East Lake Lumber Company, and also from an order entered July 23, 1919, denying defendant Crary's motion for a new trial.

Judgment and order affirmed, with costs. No opinion. Present — Dowling, Laughlin, Smith, Merrell and Greenbaum, JJ.; Smith and Greenbaum, JJ., dissenting.

GREENBAUM, J. (dissenting): The action was brought by the plaintiffs to recover $50,000 as brokers' commissions alleged to have been earned by them in producing and introducing one George F. Montgomery, who was ready, able and willing to purchase and who did purchase for the sum of $1,000,000, 186,000 acres of land with timber thereon located near Elizabeth City in North Carolina, owned by the defendant East Lake Lumber Company and a sawmill and equipment located at Elizabeth City in North Carolina owned by the defendant Dare Lumber Company. The defendant Roscoe Crary was the president of the Dare Lumber Company and the

defendant Julian E. Gittings was the president of the East Lake Lumber Company. A careful examination of the record discloses that the evidence on which plaintiffs seek to hold Crary personally liable for the commissions on the sale of the Dare and East Lake Companies' properties is confined to the testimony of the plaintiff Von Dorn and rests upon an alleged oral agreement of Crary made with Von Dorn. The documentary proofs, consisting mainly of letters which passed between Crary on the one hand and Von Dorn individually and his associate Field on the other, contradict the claim that Crary had orally agreed to be personally liable for the payment of the commissions in suit. In every instance excepting one, the letters in evidence written by Crary show that he signed his name as president of the Dare Company and that he used the plural " we " and not the singular pronoun " I." The plaintiff urges that Crary had a large personal interest in the proposed deal because of his holdings and those of his family which prompted him individually to pay the commissions. An examination of the testimony, however, discloses that Crary himself held but 176 shares of the preferred stock of the Dare Lumber Company out of 3,000 shares of preferred stock issued and outstanding and but 219 shares of the outstanding 4,650 shares of common stock of the same company. Other members of his family together owned only 1,200 shares of preferred stock and 1,800 shares of the Dare Company's stock. It thus appears that the combined holdings of all the members of Crary's family including his own stock did not amount to one-half of the outstanding capital stock. It also appears that the Dare Company had no financial or other relations with or interests in the East Lake Company outside of a " stumpage agreement." Only for the purposes of the sale of both properties had these companies determined to act in concert. A review of the oral testimony and of the documentary proofs establishes that the plaintiffs' claim hangs upon a very slender thread. Von Dorn testified to only three personal face to face interviews with Crary, the first on September 18, 1913, the second about October 20, 1913, and the third and last in November, 1913, at none of which was a third person present. He also testified that he had four telephonic talks with Crary, the first " sometime in October, 1913," the second on the last days of November or the first of December, 1913, the third on or about February 1, 1914, and the last on October 9, 1914. Von Dorn describing the first of these interviews in his own office on September 18, 1913, testified: " I remember while we were speaking of commissions he [referring to Crary] said that if they decided to allow me to offer these properties, he personally would pay the commissions. I said that that was very well, but that before we would offer these properties, *I would require commission contracts executed on behalf of both corporations* [italics ours] and I would also require copies of resolutions of the stockholders and directors of both corporations; and he told me * * * that if they decided to allow me to handle them, that they would provide all those things." Von Dorn also testified that " no arrangement was made that day as to commissions or the amount of commissions." The telephone conversation on October twenty-seventh was as follows: " Q. What did he say? A. He said he had made arrangements by letter or telegraph,

I do not recall which, to meet Mr. Field, and I think he included Mr. Howland, in my office the following day or the day afterwards, I do not recall exactly. * * *" Von Dorn further testified that he knew of the meeting which was held at his office with his consent, but that he was not present at the early part of the conversation and reached the office at about one o'clock just as Mr. Crary was leaving the office and the only conversation he then had with him was to say: "Good morning, or words to that effect, and I made some slight inquiry about the meeting and he said they had had a very satisfactory talk or understanding, I do not remember the exact words." The next time that Crary conversed with Von Dorn was in November, 1913, when there was a brief talk about a prospective buyer, Rice, and the probability of the deal going through with him. The next was a telephone conversation about the first of December, 1913, when plaintiff asked Crary if he had sent Field the copies of the resolutions of the directors and stockholders, adding: "I want them for two purposes, I want them to show to anybody that may ask us to show them to them, any prospective purchaser; and I want them for my own protection. I want to see the resolutions fixing the commissions authorizing the sale." The telephone conversation on or about February 1, 1914, according to Von Dorn was as follows: "In the course of the conversation I said: 'Mr. Crary, Mr. Field nor I have received these resolutions.' He answered very sharply, 'well,' he said, 'you do not need them.' I said: 'I would like to have them anyway.' He said: 'You do not need them at all. I have promised you your commissions if you sell this property. Go get a customer for the property and you will get your commission. Now,' he said, 'you are not going to get the minutes.' " The final telephone conversation was in October, 1914, at which nothing relevant to commissions was discussed. The foregoing resumé constitutes all of the testimony of Von Dorn as to conversations between him and Crary relative to commissions. On the other hand, we have defendant Crary's testimony in which he emphatically denies that he ever stated that he personally would pay the commissions. On cross-examination Von Dorn admitted that in every letter which he wrote to Crary he addressed the latter as president and that he never received any letter from him in which he promised personally to pay a commission. In this connection it should be borne in mind that Mr. Von Dorn was a lawyer of some years' standing, with considerable experience in his profession and in business matters. In response to the question whether Crary had told him that he was president of the Dare Company and authorized to act for it, he said: "He certainly did." He also testified that he never looked up nor made any inquiries concerning Crary's financial responsibility. Referring to his testimony on a previous trial, Mr. Von Dorn was asked on his cross-examination: "Q. Then you were asked this question: 'Q. And the only agreement that you had for $50,000 was the agreement made by Mr. Crary with Mr. Field in which you all would participate,' and did you answer: 'A. Provided we had closed the contract with Rice or Oakford.' Did you so answer? A. Yes, sir, I believe I did." On the last trial he testified that it was understood that the commission was to hold "provided we had closed the contract with

Rice or Oakford." The contract was not closed with either of these parties. The documentary evidence offered is illuminating. In a letter to Von Dorn from the Dare Lumber Company, signed by Crary as president, dated September 20, 1913, two days after the conversation at which Von Dorn claims that Crary orally agreed to pay him the commissions, it is stated *inter alia:* "*We* will give you a commission of $50,000. *We* would not care to give any more. *We* will not make it any specified per cent, and *we* will not give you any price." (Italics ours.) No objection to the use of " we " was ever made by Von Dorn. " We " clearly referred to the two companies whose property was to be sold. The resolutions of the Dare and East Lake Companies introduced in evidence show that Crary and Gittings were acting solely by virtue of the authority conferred upon them by and for their respective corporations. A letter dated October 30, 1913, to John W. Field, signed by Crary as president of the Dare Lumber Company, contains the following: " In the event of your selling the combined properties of Dare Lumber Company and the East Lake Lumber Company to Mr. Charles G. Rice * * * we agree to pay you $50,000 after we have received our money from the sale, your associates being Mr. T. F. Von Dorn of New York, Mr. B. A. Howland of Boston and the other man you mentioned." Further on in this letter it is stated: "And if the deal does not go along within a short time the agreement may be terminated at the discretion of Dare Lumber Company and East Lake Lumber Company." In another letter dated the 30th of October, 1913, from the Dare Lumber Company to John W. Field, one of the associates of Von Dorn, it was stated: " It is distinctly understood that this offer is not to be left open, but is to be taken up immediately with Mr. Rice and unless something is done within a reasonable time, the offer is to terminate." The deal was finally consummated over three years after the first interview between the parties, through the efforts of one Montgomery, a broker, who was introduced to the defendants by the plaintiff. In a letter to Colonel Johnston, a director of the East Lake Company and its representative in this matter, written September 1, 1914, Von Dorn stated: " Mr. Field emphasizes the importance of having commission contracts settled before we open negotiations with the proposed buyers. In order to do this I think it is necessary to have the East Lake Company pass resolutions authorizing the payment of the brokerage and the sale of the property." On October 21, 1914, Von Dorn wrote to Gittings, the president of the East Lake Lumber Company, a letter from which we quote the following: " Mr. Field also mentions the commissions or brokerage and suggests it should be figured on the basis of ten per cent. As you probably know, there are six or seven people who consider they are entitled to share in the brokerage in case a deal is made. The big end of the brokerage will necessarily have to go to Mr. Field. If we reach a point where a contract seems likely, I should like to have a meeting in your office of all the parties who think they should share in the brokerage and have a definite understanding." On October 14, 1914, Von Dorn wrote to Gittings: " In any deal that is made for the sale or leasing of this property we should have a final understanding in reference to the brokerage." On November 5, 1914, Von Dorn wrote to

Gittings as follows: " I anticipate some definite action on the part of the proposed buyer within a few days and will promptly post you. I think very likely they will want to meet you first in Baltimore to discuss the details. At the same time, you must be able to fix up the commission contract." On November 28, 1914, he further wrote to Gittings as follows: " I have written several letters upon the subject of the division of the commissions in which I requested that all parties claiming an interest get together, because at that time it looked as if we were getting ready to talk real business." A lengthy epistle written on February 4, 1915 by Von Dorn to Mr. Gittings states among other things: " The agreement of Col. Johnston made with my Boston friend contained a clause as follows: 'A commission agreement duly authorized by resolution of the board of directors of the East Lake Lumber Co., will be given you fixing your brokerage or compensation at twenty cents per thousand,' " etc. This letter also gives a detailed statement of what had transpired up to that date " concerning the commissions or broker-age," referring to arrangements which Mr. Crary had made for brokerage with Colonel Johnston, Mr. Smith, Miss Sharpe and Mr. Sheldon, all of whom claimed to be entitled to a share in the commissions and in which there is not a suggestion of any oral promise by Crary. That letter closes as follows: " Of course it is rather premature to be discussing these matters, but I think we might as well have an understanding in advance. * * * I do not think it would be fair to ask you to pay a 10% brokerage on the under-writing. I can only say that I want to be absolutely fair in this matter and to exercise my best endeavors to harmonize my ideas with your own as to the amount of brokerage to be paid." On May 4, 1917, he wrote to Mr. Gittings: " It has been a very long time since I have heard from you in reference to this matter, but as Col. Weeks and I brought you into negotia-tions with Mr. Montgomery for this property, we shall, of course expect you to pay the commission as agreed if it is true that Montgomery and his associates have made a purchase." The proofs also are that the plaintiffs in this action had made demands upon Gittings for payment of the com-missions " as agreed," and not having received any reply they instituted an action in Baltimore, Md., against Gittings as defendant to recover their commissions. In the complaint filed in that action it was alleged that in the month of October, 1914, they entered into negotiations with Gittings on representations that he was the president and a director of the East Lake Lumber Company and the authorized agent of the Dare Lumber Company and was authorized by resolutions of both companies to contract for the payment of commissions or brokerage or compensation to be paid in the event of a sale of the properties of the said companies and that he (Gittings) " would personally assume or adjust the compensation or commissions to be paid to the plaintiffs herein." It also appears that upon the trial of this action Von Dorn admitted that although he was asked as a witness in the former case to give the various conversations or interviews which he had with Crary, including telephonic conversations, he did not state a word to the effect that Crary had ever promised to pay the commissions. The evidence also discloses that the Dare Company as well as the East Lake Company

were abundantly solvent and able to meet all their obligations. In view of the array of facts which have been enumerated it seems incredible that the defendant Crary ever obligated himself individually to pay any commissions upon the sale of the properties in question. He had no financial interest whatever in the East Lake Company. He and his family did not even own fifty per cent of the stock of the Dare Company. It has been frequently held that oral testimony which rests upon the memory of witnesses is not as trustworthy as written or documentary evidence and that a party seeking to establish a fact contrary to the written evidence must make out his case with more than usual clearness. (23 C. J. 39; *Jackson* v. *Loomis*, 12 Wend. 27; *Duryea* v. *Zimmerman*, 143 App. Div. 60.) Even if it be assumed that an oral agreement was made with Crary in September, 1913, as Von Dorn claims, the documentary evidence conclusively shows that that arrangement was only to be binding in case he secured a certain named purchaser or purchasers within a reasonable time. He did not·procure either of these purchasers. Besides; the correspondence establishes beyond the peradventure of a doubt that if any such promise had originally been made by Crary it was superseded by the new deals involving the matter of commissions which finally resulted in a sale of the properties, through Montgomery. A mere reading of Von Dorn's letters indicates that he could not have regarded the alleged oral promise of Crary in 1913 as having any bearing whatever upon the matter of commissions based upon the transactions which finally resulted in a sale of the properties. It would seem irresistibly to follow from the foregoing facts that the verdict of the jury was not only contrary to the overwhelming preponderance of the evidence in favor of the defendant Crary, but that defendant Crary was entitled upon the whole case to a direction of a verdict in his favor upon the merits. The judgment should be reversed and the complaint dismissed upon the merits, with costs and disbursements. Smith, J., concurs.